NETHERLANDS SHIPMORTGAGE CORPORATION, LTD., Plaintiff-Appellant,

v.

Mark MADIAS and Nicholas T.K. Skarvelis, Defendants-Appellees.

Nos. 1247 and 1290, Dockets 83–7041, 83–7043.

United States Court of Appeals, Second Circuit.

Argued April 25, 1983.

Decided Sept. 12, 1983.

Robert L. Sills, New York City, for plaintiff-appellant.

Stephen M. Rathkopf, New York City, for defendants-appellees.

Before KEARSE, PIERCE and PECK *, Circuit Judges.

JOHN W. PECK, Circuit Judge:

Netherlands Shipmortgage Corporation (NSC) appeals the dismissal for lack of standing by the District Court for the Southern District of New York of its actions for recovery on a guaranty executed by Mark Madias and Nicholas Skarvelis and for voidance of a conveyance of real estate by Madias and Skarvelis to their spouses

---

without consideration.[1] NSC contends that the district court erred in holding that it did not have jurisdiction for the actions under the Ship Mortgage Act of 1920, as amended, 46 U.S.C. § 954, and that NSC is barred from bringing this action under diversity jurisdiction by New York's "door closing" statute, New York Business Corporation Law (B.C.L.) § 1312. The issues raised by the latter contention include whether NSC was doing business in New York State within the meaning of B.C.L. § 1312, whether defendants are estopped from raising B.C.L. § 1312 as a defense, and whether B.C.L. § 1312 would violate the commerce clause if applied in this case.

Although we hold that the Ship Mortgage Act does not provide the district court with jurisdiction of these actions, we reverse the judgment of the district court and remand the cause to that court for further proceedings because the district court's finding that NSC was doing business in New York for the purposes of B.C.L. § 1312 was clearly erroneous.

I

NSC is a Bermuda corporation engaged in the business of accepting deposits and making loans on "floating objects". The defendants are New York citizens and residents.

On October 23, 1981, NSC loaned Phoenix, Inc., a Liberian corporation of which Madias and Skarvelis are the principal shareholders, $1,550,000 to purchase the M/V Nagos, a ship of Liberian registry. A loan agreement between Phoenix, NSC and Triship Agency incorporating the terms of the loan was executed on August 3, 1981. In addition to executing and transferring a promissory note, Phoenix executed and delivered a mortgage on the Nagos to NSC as security for the loan. On October 23, 1981, in consideration of the making of the loan to Phoenix, Madias and Skarvelis executed

---

* Of the Sixth Circuit Court of Appeals, sitting by designation.

1. The term "defendants" is used to refer to Madias and Skarvelis, defendants in the action on the guaranty, and to Madias, Skarvelis, their spouses, and the New York partnership, Real Associates, defendants in the action to set aside the conveyance of realty.

a written personal guaranty of the obligations arising from the Note, the Mortgage and the Loan Agreement.

In 1982, Phoenix defaulted on its obligations to NSC. NSC seized the Nagos and sold it at a foreclosure sale. On September 24, 1982, NSC filed suit against Madias and Skarvelis to recover, under the guaranty, $1,508,288 as the outstanding obligations of Phoenix. On December 23, 1982, NSC initiated a second action against Madias, Skarvelis, their spouses and a New York partnership, Real Associates, to set aside conveyances of realty by Madias and Skarvelis to their spouses as fraudulent and to restrain Madias and Skarvelis from disposing of their remaining assets during the pendency of the initial action on the guaranty.

The district court, on December 23, 1982, issued a temporary restraining order prohibiting defendants from further transferring any property. An evidentiary hearing on the second action was held on December 29, 1982. On the following day, the district court delivered an oral opinion and order holding that the court did not have admiralty jurisdiction over the guaranty action, that NSC was subject to B.C.L. § 1312, and that NSC was doing business in New York State in violation of B.C.L. § 1312. The opinion subsequently was reduced to writing and supplemented with footnotes. 554 F.Supp. 375 (S.D.N.Y.1983). On the basis of the opinion the court entered orders dissolving the temporary restraining order, denying the equitable relief sought by NSC and entering a conditional order of dismissal in both actions. NSC filed a timely appeal of these orders.[2]

II

■ NSC's first contention on appeal is that the district court had admiralty jurisdiction over the action on the guaranty as a result of the Ship Mortgage Act of 1920, 46 U.S.C. § 954(a).[3] NSC argues that the Ship Mortgage Act must be read broadly because the act is remedial in nature. NSC further suggests that if admiralty jurisdiction exists, B.C.L. § 1312 will not bar its action on the guaranty. See *In re Grand Bahama Petroleum Co.*, 550 F.2d 1320 (2d Cir.1977) (construing B.C.L. § 1312 in action arising under Federal Arbitration Act). We hold, however, that the district court properly construed the Ship Mortgage Act as not conferring jurisdiction on the district court over the action on the guaranty.

■ In deciding any issue of statutory construction, consideration must first be given to the language of the statute. *Bowsher v. Merck & Co.*, — U.S. —, 103 S.Ct. 1587, 1591–92, 75 L.Ed.2d 580 (1983); *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 187, 100 S.Ct. 2601, 2608, 65 L.Ed.2d 696 (1980). Section 954(a) reads as follows:

> Upon the default of any term or condition of a preferred mortgage upon a vessel, the mortgagee may, in addition to all other remedies granted by this section, bring suit in personam in admiralty in a district court of the United States, against the mortgagor for the amount of the outstanding mortgage indebtedness secured by such vessel or any deficiency in the full payment thereof.

The district court acted properly in construing this statutory grant of jurisdiction narrowly. As the district court noted, the federal courts are courts of limited jurisdiction which may entertain a case only if there is a congressional grant of jurisdiction and a constitutional basis on which the statute rests. Additionally, as the Supreme Court has decreed, "Jurisdictional statutes are to be construed 'with precision and with fidelity to the terms by which Congress has expressed its wishes'...." *Palmore v.*

---

2. The district court's orders of conditional dismissal provided that both actions would be dismissed unless NSC qualified to do business in New York within 60 days. By order entered March 3, 1983, the district court denied NSC's motion to stay dismissal and dismissed both actions.

3. NSC does not contend that the district court had admiralty jurisdiction over the action to void the conveyance of realty.

*United States,* 411 U.S. 389, 396, 93 S.Ct. 1670, 1675, 36 L.Ed.2d 342 (1973) (quoting *Cheng Fan Kwok v. INS,* 392 U.S. 206, 212, 88 S.Ct. 1970, 1974, 20 L.Ed.2d 1037 (1968)).

In construing the terms of § 954 with precision, the district court treated the statutory phrase "against the mortgagor" as resolving this case and held that the admiralty remedy provided by the act to lenders against mortgagors cannot be judicially extended to guarantors. 554 F.Supp. at 379. It is plain from the face of the statute that the terms are words of limitation designed to restrict the grant of in personam jurisdiction in admiralty for recovery on an outstanding mortgage indebtedness to only the mortgagor. Because it is undisputed that defendants are not mortgagors, but rather are guarantors of an outstanding indebtedness, the district court properly concluded that the act did not grant in personam jurisdiction to the court over this action.

NSC also contends that the courts may determine, independent of any statutory grant, its own admiralty jurisdiction. This contention is meritless not only in light of the general principles outlined above, but also in light of the Supreme Court's statement in *The Thomas Barlum,* 293 U.S. 21, 38, 55 S.Ct. 31, 35, 79 L.Ed. 176 (1934), that the courts can neither add nor subtract from the terms of the Ship Mortgage Act in determining their admiralty jurisdiction over actions involving ship mortgages. Accordingly, the district court properly held that it did not have admiralty jurisdiction over NSC's action for recovery on the guaranty.

### III

NSC next contends that the district court has diversity jurisdiction over the actions and that the district court erred in holding that B.C.L. § 1312 operates as a bar to NSC's maintaining the action. B.C.L. § 1312(a) provides:

A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees, penalties and franchise taxes for the years or parts thereof during which it did business in this state without authority. This prohibition shall apply to any successor in interest of such foreign corporation.

Before the district court, NSC first argued that it is not doing business in New York within the meaning of B.C.L. § 1312. NSC then argued that even if it is doing business in New York in the appropriate sense, application of B.C.L. § 1312 to NSC in this case is precluded by the Commerce Clause of the United States Constitution. U.S. Const. art. 1, § 8, cl. 3. NSC finally argued that defendants are estopped from asserting B.C.L. § 1312 as a defense. NSC advances the same arguments on appeal.[4]

The district court rejected NSC's arguments. The district court held that B.C.L. § 1312 bars NSC from maintaining an action in New York courts because NSC was doing business in New York without state authorization. The district court based its finding that NSC was doing business in New York on the following facts: (1) NSC's business was soliciting and consummating loans on vessels; (2) of twenty loans consummated since NSC's incorporation, nineteen were partially closed in New York; (3) a New York law firm coordinated the papers generated by the transactions; (4) NSC's president and chief operating officer, Jaap Vriesendorp, regularly and on a recurring basis came to New York to execute documents and to solicit business; and (5) when Vriesendorp was not in New York, the New York law firm was given the power of attorney to execute documents and acted as attorney in fact. The district court, however, did not articulate the standard it applied in holding that these contacts warranted the inference that NSC was doing business in New York. After

---

4. NSC also argued before the district court that the B.C.L. was not applicable to it because it was a "moneyed corporation" exempt from such regulation. NSC does not seriously advance this argument on appeal.

finding that B.C.L. § 1312 applied to NSC, the district court held that the defendants were not estopped from asserting B.C.L. § 1312 as a defense because the overriding public policy advanced by the statute could not be negated by a private contract. Finally, the district court held that the guaranty involved an intrastate aspect of NSC's business that did not fall within the purview of the Commerce Clause.[5]

As an initial point, we note that NSC's arguments that B.C.L. § 1312 is not applicable by its own terms and that application of B.C.L. § 1312 to this case is precluded by the Commerce Clause overlap in large part due to the limitations placed on the scope of B.C.L. § 1312 by the New York legislature and the New York courts. B.C.L. § 103(b) expressly provides that the New York Business Corporation Law "applies to commerce with foreign nations and among the several states ... only to the extent permitted under the constitution and laws of the United States." Moreover, the New York courts have been particularly mindful "[i]n construing statutes which license foreign corporations to do business ... to avoid unlawful interference with interstate commerce." *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917). Finally, as will become clear, B.C.L. § 1312 has been applied only where the foreign corporation's contacts with New York "exhibit the sort of localization or intrastate character which [the Supreme Court has] required in situations where a State seeks to require a foreign corporation to qualify to do business." *Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, 33, 95 S.Ct. 260, 267, 42 L.Ed.2d 195 (1974).

■ There is no question that diversity jurisdiction exists. NSC is a Bermuda corporation with its principal place of business in Bermuda. The individual defendants are citizens and residents of New York while the defendant partnership is organized and exists under the laws of New York and has its principal place of business in New York.

Accordingly, the statutory and constitutional requirements of diversity jurisdiction are satisfied. 28 U.S.C. § 1332; *Verlinden B.V. v. Central Bank of Nigeria,* —— U.S. ——, 103 S.Ct. 1962, 1970 n. 18, 76 L.Ed.2d 81 (1983). Moreover, it is well-settled that B.C.L. § 1312 does not raise a jurisdictional bar. *Tri-Terminal Corp. v. CITC Industries, Inc.,* 78 A.D.2d 609, 432 N.Y.S.2d 184 (1st Dept.1980) (mem.); *Hot Roll Manufacturing Co. v. Cerone Equipment Co.,* 38 A.D.2d 339, 329 N.Y.S.2d 466 (3d Dept. 1972). Instead, B.C.L. § 1312 affects the legal capacity of a foreign corporation doing business in New York without authorization to maintain an action in New York courts. *Hot Roll, supra.* Because jurisdiction rests on diversity, B.C.L. § 1312 precludes the maintaining of an action by an unauthorized foreign corporation not only in the state courts of New York but also in the federal courts located in that state. *Woods v. Interstate Realty Co.,* 337 U.S. 535, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949).

The initial question to be resolved is whether the district court's finding that NSC is doing business in New York for the purposes of B.C.L. § 1312 was clearly erroneous. Fed.R.Civ.P. 52. The clearly erroneous standard of review is applicable because the determination that a foreign corporation is doing business in New York for the purposes of B.C.L. § 1312 is factual in nature. *See, e.g., Berkshire Engineering Corp. v. Scott-Paine,* 29 Misc.2d 1010, 217 N.Y.S.2d 919 (Cty.Ct.1961); *Lebanon Mill Co. v. Kuhn,* 145 Misc. 918, 261 N.Y.S. 172 (Mun.Ct.1932).

Even though no precise measure of the nature or extent of the activities may be determinative of whether a foreign corporation is doing business in New York and each case must be decided on its own facts, *William L. Bonnell Co. v. Katz,* 23 Misc.2d 1028, 196 N.Y.S.2d 763 (Sup.Ct.1959), general guidelines exist which are instructive. An initial principle is that not all business activity engaged in by a foreign corporation

---

**5.** The district court also held that NSC was not a "moneyed corporation" exempt from the op-

eration of the B.C.L. See footnote 4 *supra.*

constitutes doing business in New York. *Von Arx, A.G. v. Breitenstein,* 52 A.D.2d 1049, 384 N.Y.S.2d 895 (4th Dept.1976) (mem.), *aff'd mem.,* 41 N.Y.2d 958, 363 N.E.2d 582, 394 N.Y.S.2d 876 (1977). Indeed, some business activity that might suffice to subject a foreign corporation to the jurisdiction of New York courts will not suffice to constitute doing business for B.C.L. § 1312. *Von Arx, supra; Paper Manufacturers Co. v. Ris Paper Co.,* 86 Misc.2d 95, 381 N.Y.S.2d 959 (Civ.Ct.1976). *See Tauza, supra.* The classic articulation of the standard for doing business in New York for the purposes of the foreign corporation licensing statutes is contained in a discussion of a predecessor of B.C.L. § 1312 in *International Fuel & Iron Corp. v. Donner Steel Corp.,* 242 N.Y. 224, 230, 151 N.E. 214, 215 (1926):

> To come within this section, the foreign corporation must do more than make a single contract, engage in an isolated piece of business, or an occasional undertaking; it must maintain and carry on business with some continuity of act and purpose.

New York courts have repeatedly and recently affirmed the vitality of this standard which requires the intrastate activity of a foreign corporation to be permanent, continuous, and regular for it to be doing business in New York. *See, e.g., Parkwood Furniture Co. v. OK Furniture Co.,* 76 A.D.2d 905, 429 N.Y.S.2d 240 (2d Dept.1980) (mem.); *Continental Shows, Inc. v. Essex County Agricultural Society, Inc.,* 62 A.D.2d 1103, 404 N.Y.S.2d 418 (3d Dept.1978) (mem.); *Colonial Mortgage Co. v. First Federal Savings & Loan Ass'n of Rochester,* 57 A.D.2d 1046, 395 N.Y.S.2d 798 (4th Dept. 1977) (mem.).

■ Applying this standard to the instant case, the question facing this court is whether an inference from the evidence before the district court that NSC's intrastate business activity in New York is permanent, continuous and regular would be clearly erroneous. *Lebanon Mill, supra.* A review of the decisions of the New York courts indicates that such an inference is warranted only where there is a showing either of some ongoing intrastate business activity or the establishment of an ongoing business practice. *See also Allenberg Cotton, supra* (qualification statute applicable to foreign corporation only where there is localization of business or intrastate business activity).

On several occasions, New York courts have found a foreign corporation to be doing business in New York in the absence of proof of a substantial business presence where there was proof of ongoing intrastate business activity. In *Paper Manufacturers, supra,* a Pennsylvania paper manufacturer was found to be doing business in New York under B.C.L. § 1312 based on the company's intrastate business activity. The company conceded that it was regularly engaged in New York in inducing the purchase of its products by New York users from New York distributors. The court held that because this activity was regular and intrastate in nature, no evidence that the company maintained an office and a telephone in New York was necessary to warrant the finding that the company was doing business in the state. The court finally held that application of B.C.L. § 1312 in the case did not violate the Commerce Clause because of the existence of intrastate activity.

In reaching its decision, the court in *Paper Manufacturers* relied upon *Eli Lilly & Co. v. Sav-On-Drugs, Inc.,* 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), in which the Supreme Court upheld a New Jersey foreign corporation qualification statute similar to B.C.L. § 1312. In *Lilly,* a New Jersey state court dismissed an action brought by Lilly, an Indiana corporation that had not obtained a certificate authorizing it to transact business in New Jersey, on the basis of Lilly's noncompliance with the qualification statute. Lilly claimed that application of New Jersey's qualification statute violated the Commerce Clause because it was not involved in intrastate business activity and because it was involved in substantial interstate activity. The Supreme Court rejected Lilly's positions and held that the in-state inducement of pur-

chases of a particular product from in-state wholesalers by in-state retailers was intrastate business activity subjecting a corporation to state regulation even if it also was engaged in interstate business activity.

The *Paper Manufacturers* court has not been alone among New York courts in finding a foreign corporation to be doing business in New York based on a showing that the corporation is engaged in ongoing intrastate business. In *Conklin Limestone Co. v. Linden,* 22 A.D.2d 63, 253 N.Y.S.2d 578 (3d Dept.1964), a Connecticut limestone dealer was held to be doing business in New York even though it had no office and employed no salesman in New York. The court held that the foreign corporation was doing business in New York because it not only sold limestone in interstate commerce but applied the limestone over extensive farm acreage from special equipment that was operated by corporate employees. The court treated the application of the limestone to the farms as intrastate activity that subjected the foreign corporation to the New York qualification statute. Like the court in *Paper Manufacturers,* the court emphasized that only because the intrastate business conduct was both regular and continuous did the foreign corporation come under the qualification statute.

It is clear that the evidence does not support the inference that NSC engaged in regular and continuous intrastate business activity in New York. The district court specified only one instance in which NSC engaged in intrastate business activity, *viz.,* the execution and deliverace of the guaranty at issue in this case. The district court treated the guaranty as an intrastate transaction based on the following considerations: the guarantors are New York residents; the guaranty was negotiated in New York; the guaranty was executed and delivered in New York; enforcement was sought in New York; and enforcement is against real property in New York. For the purposes of its opinion, the district court accepted that in financing the purchase of vessels to be used in foreign trade NSC was engaged in foreign commerce. The district court held, however, that *Allen-*

*berg Cotton* did not require treatment of the guaranty as incidental to the foreign commerce because other financing arrangements that were not substantially intrastate in nature were available to NSC.

The guaranty transaction is inadequate to warrant a finding of ongoing intrastate business activity on the part of NSC on several grounds. As an initial point, it is not altogether clear that the guaranty is an intrastate transaction. That NSC brought its actions in New York and sought enforcement against real property situated in New York does not indicate that the guaranty is intrastate in nature. *See Buck Stove & Range Co. v. Vickers,* 226 U.S. 205, 33 S.Ct. 41, 57 L.Ed. 189 (1912) (action in Kansas state court by unlicensed foreign corporation to set aside conveyance of realty as fraudulent not barred by qualification statute where corporation's business activity is interstate in nature). Moreover, the district court's treatment of the guaranty as an intrastate transaction separable from the underlying financial transaction, which can only be viewed as involving foreign commerce, is at odds with both the terms of the loan agreement which expressly incorporates the guaranty and the customary practice of requiring a guaranty as part of the financing of the purchase of a vessel. *Cf. Allenberg Cotton, supra,* 419 U.S. at 29–31, 95 S.Ct. at 265–266 (treating transaction, which viewed in isolation was intrastate in nature, as a part of interstate commerce because in light of course of dealing and business practices it was essential for completion of an interstate transaction). Even if the guaranty is an intrastate transaction, however, by itself it amounts to no more than an occasional or incidental intrastate business transaction which the New York courts repeatedly have held to be insufficient to subject a foreign corporation to qualification statutes. *E.g., Conklin Limestone, supra,* 22 A.D.2d at 64, 253 N.Y. S.2d at 580; *Lebanon Mill, supra,* 145 Misc. at 921, 261 N.Y.S. at 174; *Penn Collieries Co. v. McKeever,* 183 N.Y. 98, 103, 75 N.E. 935, 936 (1905). Accordingly, the evidence is inadequate to support the inference that

NSC is doing business in New York based on its intrastate business activity.

The question of whether NSC is doing business in New York is not resolved by this determination because rather than determining whether a foreign corporation is doing business based on ongoing intrastate business activity, New York courts more commonly have based their decisions on the extent, both quantitative and qualitative, of the corporation's activity in the state. In so doing, the courts have followed an approach recognized by the Supreme Court in *Union Brokerage Co. v. Jensen*, 322 U.S. 202, 64 S.Ct. 967, 88 L.Ed. 1227 (1944). In *Union Brokerage,* the Court held that a Minnesota foreign corporation qualification statute could be applied to a North Dakota customhouse brokerage firm, the business of which was related to foreign commerce, without violating the Commerce Clause because the firm had localized its business activity in Minnesota resulting in "a wide variety of dealings with the people in the community." *Id.* at 210, 64 S.Ct. at 972.

The New York courts have discussed on numerous occasions the factual question of how extensive must a foreign corporation's contacts with and business activity in New York be for the corporation to be doing business under B.C.L. § 1312. It is well-settled that a temporary or an insubstantial business presence will not warrant an inference that a foreign corporation is doing business in New York. In *Lebanon Mill, supra,* the court held that a Rhode Island corporation was not doing business in New York even though its name was listed on the directory of a New York building that housed its New York sales agent, invoices bearing its name were sent from the office of its New York agent, and it maintained a New York bank account. The court noted that foreign corporations may engage in a variety of business activities in New York without complying with its qualification statute.

"A foreign corporation may send its agents into this State to make contracts for the purchase or sale of goods without falling within the inhibitions of our stat-

ute." *International Fuel & Iron Corp. v. Donner Steel Co.,* 242 N.Y. 224, 229, 151 N.E. 214, 215. It may, with like immunity, provide its agents with a meeting place or headquarters. Id. It may appoint a local selling agent; and its name may appear on the door of the place of business occupied by the local selling agent. *Schwarz v. Sargent* (Sup.) 197 N.Y.S. 216. It may include its name in the telephone directory as of the address of its selling agent. *Rosenblatt v. Bridgeport Metal Goods Mfg. Co.,* 105 Misc. 92, 173 N.Y.S. 331. It may ship goods to commission merchants to be sold on consignment. *Brookford Mills, Inc. v. Baldwin,* 154 App.Div. 553, 139 N.Y.S. 195; *Badische Lederwerke v. Capitelli,* 92 Misc. 260, 155 N.Y.S. 651. None of these activities, per se, constitute doing business in this state, within the meaning of section 218, General Corporation Law.

Evidence of a single sale (*New York Architectural Terra-Cotta Co. v. Williams,* 102 App.Div. 1, 92 N.Y.S. 808), or two sales (*Ozark Cooperage Co., Inc., v. Quaker City Cooperage Co.,* 112 App.Div. 62, 98 N.Y.S. 113), or even a "series of sales" (*Angldile Computing Scale Co. v. Gladstone,* 164 App.Div. 370, 375, 149 N.Y.S. 807) does not, per se, warrant a finding that a foreign corporation is "doing business" here. Such activity falls within the permissible latitude of the occasional, noncontinuous transaction of business.

145 Misc. at 920–21, 261 N.Y.S. at 175. The court held that the facts described above failed to warrant an inference of continuity of activity and apparent permanence of a local business situs to bring the foreign corporation within the qualification statute's bar.

In a similar case, *William L. Bonnell Co. v. Katz, supra,* the court held that an unlicensed foreign corporation could maintain an action on a series of notes and a written guarantee even though its name was listed on the office door of its sales representative and on the building directory, its name was listed in telephone directories, it had a salaried employee in New York, and it made

most of its collections at the office of its sales representative. The court noted the presumption that a foreign corporation does business in its own state and not in New York, and, citing *International Fuel & Iron Corp. v. Donner Steel Co., supra* 242 N.Y. at 230, 151 N.E. at 215, and *Penn Collieries Co. v. McKeever, supra* 183 N.Y. at 103, 75 N.E. at 936, stated:

> While I have been unable to find any case where the facts are similar to those presented here, the law is well settled that to be "doing business" in this State implies corporate continuity of conduct in that respect such as might be evidenced by the investment of capital here, with the maintenance of an office for the transaction of its business and those incidental circumstances which attest to the corporate intent to avail itself of the privilege to carry on a business. In other words, it is the exercising of its corporate franchises and maintenance of a place of business within the State in the sense that corporations organized and doing business under the laws of *this* State maintain such places of business.

*Id.* at 1030–31, 196 N.Y.S.2d at 767 (citations omitted). The court concluded that the foreign corporation's activity in New York was inadequate to demonstrate that it was carrying on sufficient intrastate business activity to be doing business within the meaning of the licensing statute.

The court in *Parkwood Furniture, supra,* provides an indication of when a foreign corporation's activities in New York are so substantial that the corporation is subjected to the licensing requirements of B.C.L. § 1312. In *Parkwood Furniture* the court held that a foreign corporation was doing business in New York where it maintained two sales agents and a repairman in New York, sent its president into the state to resolve problems with a purchaser and to solicit additional sales, took and solicited orders in New York, and earned more than $2,000,000.00 in sales in New York in a two-year period. Additionally, one of the agents maintained a special telephone number for New York sales. On these facts the court held "that this type of regular systematic, extensive and continuous business, resulting in a large volume of sales, both in number and dollar amounts, constituted the doing of business within the meaning and intent of section 1312 (subd. [a]) of the Business Corporation Law." 76 A.D.2d at 905–06, 429 N.Y.S.2d at 241 (citations omitted).

In *Colonial Mortgage, supra,* the court made clear that the volume of sales of a corporation in New York is not dispositive on the issue of whether a corporation is doing business in New York for the purposes of B.C.L. § 1312. In holding that the foreign plaintiff, Colonial Mortgage, was not doing business in New York, the court stated that "[t]he fact that Colonial has sold $40,000,000 worth of certificates in New York and that the contract in this case was made in New York is not controlling." *Id.* at 1047, 395 N.Y.S.2d at 799. The court found an absence of regular, continuous and permanent activity on the part of Colonial in New York based on evidence that Colonial "does not maintain a bank account, own real property, maintain an inventory of securities, or an office for the purpose of transacting business, a telephone listing, advertise for the sale of securities [in New York] or employ any New York resident." *Id.,* 395 N.Y.S.2d at 799. The court held that Colonial's employment of a New York agency to act as a middleman or "bird dog" in its transactions in New York did not support a finding that Colonial was doing business in New York.

Our review of the decisions concerning New York's qualification statutes makes clear that in the absence of evidence of ongoing intrastate business activity, the inference that a foreign corporation is doing business in New York must be based on evidence of substantial and permanent or continuous business activity in the state, *i.e.,* evidence that the corporation has localized some portion of its business activity in New York. Turning to the instant case, we hold that the evidence is insufficient to warrant the inference that NSC has localized its business activities in New York to such an extent that it has established a

regular, continuous and permanent business presence in the state. The record indicates that the extent of NSC's activities in New York are: the maintenance of New York bank accounts; retention of New York counsel; travel to New York by NSC's president to solicit business and to negotiate loans; and the partial closing of 19 of 20 loans transacted by NSC over a two-year period at its counsel's office in New York. Considered individually, none of these activities would allow an inference that NSC is doing business in New York. First, B.C.L. § 1301(b)(3) specifically excludes consideration of the maintenance of bank accounts in New York to be doing business in New York for the purposes of B.C.L. § 1312. *See also Lebanon Mill, supra.* Second, retention of and consultation with New York counsel does not constitute doing business in New York even for the purposes of jurisdiction and service. *Hastings v. Piper Aircraft Corp.,* 274 A.D. 435, 438, 84 N.Y.S.2d 580, 584 (1st Dept.1948); *Glacier Refrigeration Service, Inc. v. American Transportation, Inc.,* 467 F.Supp. 1104, 1106 n. 1 (E.D. N.Y.1979). Third, courts have repeatedly held that travel into a state for solicitation and occasional negotiations does not constitute doing business in New York. *Samuels v. Mott,* 29 Misc.2d 705, 211 N.Y.S.2d 242 (Sup.Ct.1960); *Textile Banking Co. v. Colonial Chemical Corp.,* 285 F.Supp. 824 (N.D. Ga.1967); *Stafford-Higgins Industries, Inc. v. Gaytone Fabrics, Inc.,* 300 F.Supp. 65 (S.D.N.Y.1969). Fourth, the partial closing of the loans in New York is legally less significant than the making of a contract and courts have held foreign corporations not to be doing business in New York even though the contracts at issue were made there. *International Fuel & Iron Corp., supra,* 242 N.Y. at 229, 151 N.E. at 215; *Lebanon Mill, supra,* 145 Misc. at 921, 261 N.Y.S. at 175; *Manhattan Fuel Co. v. New England Petroleum Corp.,* 422 F.Supp. 797, 803 (S.D.N.Y.1976), *aff'd mem.,* 578 F.2d 1368 (2d Cir.1978).

Considering these activities as an aggregate does not alter the conclusion that NSC is not doing business in New York. On its facts, this case is analogous to *Samuels,* *supra,* in which the court held that an assignee of the Admiral Credit Corporation, a Delaware corporation with its home office at Chicago, Illinois, could maintain an action on sixteen separate promissory notes even though Admiral Credit was not licensed to do business in New York. The court based its decision on its findings that Admiral Credit had no office in the state, sold no products in the state, and executed the notes that were sued upon outside the state. The court further held that the existence of some activity in the state on Admiral Credit's part did not warrant a contrary result. Indeed, the court explicitly held that Admiral Credit was not doing business in New York even though it derived considerable business from the state, repeatedly sent employees into the state, and directed to its wholesale distributors their method of operation.

In the instant case, NSC had no office in New York, employed no residents of New York, made no loans directly to New York residents, transacted no loan that was guaranteed by a New York resident or corporation with the exception of the loan and guaranty at issue, had no New York telephone listing, and had no New York post office address. The activity that NSC did pursue in New York simply does not constitute "the corporate continuity of conduct ... such as might be evidenced by the investment of capital here, with the maintenance of an office for the transaction of its business, and those incidental circumstances, which attest the corporate intent to avail itself of the privilege to carry on a business." *Penn Collieries Co. v. McKeever, supra,* 183 N.Y. at 103, 75 N.E. at 936. *Accord, Bonnell Co., supra,* 23 Misc.2d at 1030–31, 196 N.Y.S.2d at 767. Based on a comparison of the contacts each had with New York, it is clear that NSC's activity was less substantial than that of Admiral Credit.

In addition to *Samuels,* several other courts have held that foreign corporations engaged in more substantial activity than engaged in by NSC in New York were not doing business in the state for purposes of

the statute. In *Textile Banking Co. v. Colonial Chemical Corp., supra,* the court, construing B.C.L. § 1312, held that a foreign corporation was not doing business within a state where it maintained no agent, employee or bank account in the state even though approximately twenty employees had visited the state on business on ninety-eight separate occasions over a two-year period and the loans made to state residents exceeded a total of $3,000,000.00. Similarly, in *Stafford-Higgins, supra,* the court held that a Connecticut corporation was not doing business in New York even though: (1) it placed orders in New York; (2) delivery was made to the Connecticut corporation's New York independent contractor; (3) the corporation maintained a New York office and New York telephone listings; and (4) the corporation maintained five salesmen in its New York office. Persuaded if not controlled by these decisions, we hold that NSC was not doing business in New York on the basis of its business activity in that state.

In reaching this decision, we note that no court has held a foreign corporation to be doing business in New York based on as little business activity in New York as was engaged in by NSC. The facts of *Parkwood Furniture, supra,* on which defendants most strongly rely, demonstrate a substantially greater localization of the foreign corporation's business activity than in NSC's case. Although both in *Parkwood Furniture* and here the foreign corporations sent their presidents into New York on occasion, NSC did not maintain the continuous and systematic business presence that the foreign corporation in *Parkwood Furniture* did because NSC, unlike that corporation, did not maintain employees in New York, maintain a New York telephone number, or directly solicit business activity from New York residents from within the state. Due to these substantial factual differences between *Parkwood Furniture* and the instant case, we do not find that that decision dictates a result contrary to the one we have reached.

In sum, we hold on the basis of the foregoing that the finding of the district court that NSC was doing business in New York

for the purposes of B.C.L. § 1312 was clearly erroneous because the record does not allow the inference that NSC engaged in regular and continuous intrastate activity or conducted substantial, permanent or continuous business in New York. Because of our holding on this issue, we need not reach NSC's remaining contentions.

The judgment of the district court is reversed and the cause is remanded to the district court for proceedings not inconsistent with this opinion.